Filed 9/25/15  Diana S. v. Super. Ct. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DIANA S., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, <br><br> Respondent; <br><br> SAN FRANCISCO HUMAN SERVICES AGENCY, ET AL., <br><br> Real Parties in Interest. | A144879 <br><br> (San Francisco County Super. Ct. No. JD143247) |

This is a petition for an extraordinary writ, as authorized by rule 8.452 of the California Rules of Court.  The petitioner is Diana S., a mother who seeks to have overturned the order of respondent Superior Court setting a hearing pursuant to Welfare and Institutions Code section 366.26[1] at which her parental rights may be terminated with respect to her infant son.  She contends substantial evidence does not support the findings made by respondent court that (1) real party in interest San Francisco Human Services Agency (Agency) provided adequate reunification services, and (2) there was a substantial risk of detriment to the child's safety and well being if he was restored to petitioner's custody.  We conclude both contentions are without merit, deny the petition on the merits, and dissolve the stay previously issued.

---

[1]  Statutory references are to this Code.

1

## BACKGROUND

The points and authorities supporting the petition, and the Agency's response thereto, establish that both parties are thoroughly conversant with the record. Most of the salient events and details are not controverted. There is consequently no need to reiterate them all here. The following narrative is tailored to the issues presented for decision, and viewed most favorably to the order being challenged. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

The relevant timeframe begins when petitioner and the very young Jeremiah[*] were living with petitioner's aged and infirm mother. After attacking her mother, and forcing her out of her own home, petitioner was found wandering the street with Jeremiah. The Agency took Jeremiah into custody, while petitioner underwent a psychiatric examination under the Lanterman-Petris-Short Act (§ 5150). The mother told police that petitioner was "bipolar and violent when she is off her medication." Jeremiah was detained and placed with his paternal grandmother. After petitioner threatened Jeremiah's presumed father and attacked the paternal grandmother, counsel for Jeremiah secured a restraining order directing petitioner to stay away from Jeremiah, his father, and the paternal grandmother.[2] Petitioner's mother had her own restraining order against petitioner. (See fn. 4, *post*.)

At the unreported combined jurisdictional and dispositional hearing held in August 2014, petitioner submitted to the four allegations of the Agency's amended dependency petition, as recited on the Judicial Council JV-190 form "on the basis of the social worker's . . . report . . . and other documents."[3] Three of the four allegations concerned

---

[*][Jeremiah was almost eight months old. (CT 1, 3)]

[2]  The father was involved in the dependency, but he is not a party to this proceeding.

[3]  "[I]t is not uncommon in dependency proceedings for a parent to 'submit' on a social services report. [Citations.] By submitting on a particular report or record, the parent agrees to the court's consideration of such information as the only evidence in the matter. Under such circumstances, the court will not consider any other evidence in deciding whether the allegations are true. [Citation.] [¶] Notwithstanding a submittal on a particular record, the court must nevertheless weigh evidence, make appropriate evidentiary findings and apply relevant law to determine whether the case has been

failings and conduct by petitioner.[4]  Jeremiah was declared a dependent child, and his care and custody entrusted to the Agency for placement with a relative.  The minutes recite that "Reunification requirements attached as to both parents."  The attachment for petitioner stated:

"[T]o be considered for reunification, the mother . . . must complete the following service plan:

proved.  [Citation.] In other words, the parent acquiesces as to the state of the evidence yet preserves the right to challenge it as insufficient to support a particular legal conclusion.  [Citation.]  Thus, the parent does not waive for appellate purposes his or her right to challenge the propriety of the court's orders."  (*In re Richard K.* (1994) 25 Cal.App.4th 580, 588-589.)  "Only when a parent submits on a social worker's recommendation does he or she forfeit the right to contest the juvenile court's decision if it coincides with that recommendation."  (*In re T.V.* (2013) 217 Cal.App.4th 126, 136; accord, *Rosa S. v. Superior Court* (2002) 100 Cal.App.4th 1181, 1186-1187.)

[4]   The three allegations read in relevant part:

"The mother has mental health issues and is not receiving treatment; as a result on 07/08/2014, San Francisco Police Department transported the mother to psychiatric emergency services at San Francisco General Hospital for a 72 hour mental health detention and there was no appropriate care providers available to provide care for the infant which places the infant at risk of harm and/or neglect."

"The mother is unable to provide proper care, shelter, and supervision for the child. On 07/08/2014, an emergency protective order was issued . . . protecting the infant's maternal grandmother who was the infant's prior childcare provider . . . against the mother.  The mother was residing with the maternal grandmother however the mother is currently homeless which places the infant at risk for harm and/or neglect."

"The minor is at risk of harm in that on July 16, 2014, . . . the mother attacked paternal grandmother (PGM).  While PGM had the minor in a stroller, the mother lunged at PGM to grab the minor.  PGM had to duck in order to avoid the minor getting hit by mother. Mother was screaming and yelling, and as a result the minor cried uncontrollably for an hour and a half.  The mother continues to harass father and PGM, making false reports to C.P.S. [Child Protective Services] and the police . . . .  As a result of mother's threatening and harassing behavior, a temporary restraining order was issued on July 17, 2014 protecting minor, PGM, and . . . father from the mother.  The mother is continuing to violate the TRO by sending PGM harassing text messages, making baseless referrals to C.P.S., and going to the PGM's home."

The fourth allegation was "The father has failed to protect the child from abuse and neglect from the mother.  The father has mental health issues and is unable to provide for the child."

3

"1.  That the mother remains under the care of a qualified mental health professional and complies with the mental health professional's recommendations for psychotherapy and/or prescribed medication.

"2.  That the mother undergo a psychological evaluation and follow any recommended treatment.  The evaluation should address:

"a)  The mother's ability to adequately protect and parent the child.

"b)  Recommendations for therapy and/or medication.

"3.  That the mother successfully completes a parenting education program focusing on parenting skill building for a first time parent.

"4.  That the mother complies with appropriate restraining orders.

"5.  That the mother obtains and/or maintains suitable housing for herself and the child for a reasonable period of time prior to reunification.  The parent's responsibility will be to locate and apply for housing.  The responsibility of the [Agency] will be to provide housing referrals when needed.

"6.  That the mother visits the child on a regular basis prior to reunification and maintains other contact and involvement, as arranged by the Child Welfare Worker."

Two weeks later, the father renewed the restraining order protecting him, his mother, and Jeremiah from petitioner.  The order was good for five years.

Three months later, long before the six-month review hearing was set to be heard, petitioner moved "the court to terminate its jurisdiction" and order immediate reunification with Jeremiah.  The court summarily denied the motion as not in the minor's best interest.

The six-month review hearing was eventually held over the course of three days in March 2015.  On the first and second days, the court heard testimony from the two caseworkers who had handled petitioner's case.  The initial caseworker, who handled the case for only 11 days, testified about how she was assaulted by petitioner.  Petitioner followed it up with "several text messages saying, 'F' CPS and 'F' you.  I hate you and welfare trash . . . I hope you rot in hell.  You need to take responsibility.  It's your fault."  The case worker reported the incident to police.  Petitioner had previously made

4

disparaging remarks about the paternal grandmother. She denied having any mental problem ("There's nothing wrong with me"). And she made a not so veiled threat that was heard by the case worker ("I could kill you and get away with it. [It's] one of the perks of having a mental health diagnosis"). Petitioner did not want referrals for services, and told the caseworker she did not want visits with Jeremiah. As a result of the assault, a new caseworker was assigned, something rarely done by the Agency.

The replacement caseworker, Allan Cohen, had prepared the Status Review Report and the Addendum Report, both of which were received into evidence at the start of the hearing. The gist of those reports, and Mr. Cohen's testimony, may be summarized as follows:

Petitioner initially refused to participate with her case plan, and refused to meet with Cohen because "she felt I was against reunifying her with her son." There was some subsequent involvement, but it was ineffectual. Cohen testified that petitioner's attitude was "very uncooperative," and her compliance with the case plan was "minimal." Petitioner met with Cohen only once, at the end of December 2014, "when she realized that that the Agency was recommending termination of family reunification and that Jeremiah could be adopted . . ." At that meeting, petitioner "made it very clear from the outset that she would need services that would fit into her schedule so she would not miss any work. She repeatedly remarked that the services are set up for unemployed people on welfare."

Petitioner had seen a therapist (one recommended by the Agency), who told Cohen that there was no "medical necessity" for petitioner to have further treatment. Cohen did not agree with this conclusion, and he discounted it, because he felt it was made as the result of financial considerations. Another professional told Cohen he had not seen petitioner "in quite some time." In December 2014, petitioner told Cohen "not to send her any more referrals, which she says she throws away." In his Addendum Report, Cohen informed the court that he "asked Ms. S[.] to request a new therapist through her Kaiser Health Care Plan that she is now receiving from her employer. I have yet to hear . . . if she has followed through with requesting a therapist."

5

Petitioner's general belief was that she had no mental health issues. As Cohen put it in his Status Review Report: "Ms. S[.] denies that she has any mental health problems and is adamant that her mental health diagnosis is a mistake and therefore has no impact on her son." In fact, "Ms. S[.]'s psychological assessment does . . . include a diagnosis of bi-polar disorder and a personality disorder not otherwise specified with borderline features." When Cohen pointed this out to petitioner (over the phone because petitioner "refused to sit down with me"), "she flatly dismissed them as outrageous and she asserted that the psychologist who performed the assessment was incompetent."

That psychologist also recommended that petitioner "be monitored closely for medication compliance," but Cohen received only one, partial, report, done in December 2014. Although at the hearing Cohen testified that petitioner "is currently taking medication to manage her mental illness, . . . she has repeatedly stated to me that she wants to get off of medication and have her diagnosis changed because she says she is not mentally ill" and "does not believe she needs the medication." Cohen believed this attitude "is highly typical of someone with no insight with bipolar disorder and . . . highly likely that she's going to have another mental health crisis and . . . to need hospitalization again."

On the occasions petitioner admitted a problem, she blamed it on her mother. Petitioner is estranged from her family. Her mother is still afraid of her, as is the paternal grandmother. Petitioner has been "very evasive" about providing confirmation that she was taking her prescribed medications. Cohen had such confirmation only starting in January 2015, two months before the hearing. Cohen reported in his Status Review Report that petitioner "says that she takes her psychotropic medication but initially refused to sign a release for me to speak with her mental health case manager and psychiatrist. Eventually she did sign releases but it turned out that she had hardly met with either provider . . . ."

Petitioner eventually told Cohen that she had housing, but, as of the hearing, she had refused to let Cohen inspect it. Before that "she refused to provide her address."

6

According to Cohen, petitioner "has exhibited bizarre, inappropriate and difficult behavior," including aggression, "rage, volatility and poor impulse control from the outset of the case." She has no remorse about assaulting the first case worker. She also assaulted her husband at a court hearing because "the hearing was for her and [the father] and his mother had no right to be present." Petitioner believed that both assaults were justified. Petitioner continues to make groundless allegations against the paternal grandmother. "Insulting" and cursing are frequently directed at Cohen and other Agency personnel speaking with petitioner. So are "verbally abusive daily phone calls." "On at least two occasions" petitioner told Cohen "that she could kill someone and . . . not go to jail because of her mental health diagnosis."

There are two restraining orders, but petitioner has violated them "on multiple occasions." Petitioner told Cohen she could violate the orders with impunity "because she has a diagnosis, so . . . if the police come, they're not going to do anything to her." She also told Cohen in effect that she would go on flouting the orders because "there's a higher power, and she's got a right to see her son." Petitioner bombards Cohen, and other Agency personnel, with text and e-mail messages, and misrepresents to others what occurs in conversation with Cohen. On one occasion petitioner telephoned the Agency, stated "she was the paternal grandmother and that her grandson was dead, which really horrified the staff . . . ."

Petitioner refused to visit Jeremiah, giving a variety of reasons: "because the two visitation sites . . . were in dangerous neighborhoods which would put Jeremiah at risk," "she could not tolerate having anyone supervise her visits," "having a time limited visit and then being separated would be too emotionally difficult for her and Jeremiah." Petitioner agreed to start visitation when she finally met with Cohen. There were only three visits when Cohen submitted his Addendum Report on March 6, 2015. One of the psychologists who examined petitioner concluded that "all visits with Jeremiah should be supervised at all times." Cohen observed the second visit. Petitioner brought toys for Jeremiah, but took them with her when she left. Cohen had the impression that what she

7

was saying to Jeremiah was "totally inappropriate" and really intended for him. Cohen thought Jeremiah "looked a little distressed at his mother's intensity."

The incident that started this dependency "resulted in her [petitioner's] eighth psychiatric hospitalization." The commitments "occur about twice a year," most have lasted two weeks, "which is unusual in mental health" and "speaks to . . . how out of control she can be, and so that really concerns me."

Petitioner did complete a "parent education program," but Cohen did not believe petitioner had benefitted from it.

Cohen concluded that petitioner "has not gained any insight into her mental health issues and this has prevented real safety planning . . . [H]er extremely poor insight means that Jeremiah would remain at great risk if he were returned to her care." The recommendations of Cohen and the Agency were that the court end reunification services to petitioner, and schedule a permanent plan selection hearing.

Petitioner submitted a written trial brief in which she argued that (1) "Jeremiah must be returned to Ms. S[.] because the Agency failed to show that Jeremiah will suffer substantial detriment if returned," and (2) "the court must order six more months of reunification services because there is a substantial probability that Jeremiah may be returned to Ms. S[.] by the 12 month review hearing."

At the hearing, petitioner's counsel had the following exchange with Cohen:

"Q. . . . I'd . . . now like to shift and talk a little bit about things that weren't ordered. [¶] So prominent through this case, as you look at it, are concerns about Ms. S[.]'s volatility; correct?

"A. Yes.

"Q. And her impulse control; correct?

"A. Yes.

"Q. And yet there was no recommendation that Ms. S[.] engage in any kind of anger management; correct?

"A. Yes. I mean, I guess that's true. It's not part of her case plan."

8

"Q. My point, Mr. Cohen, is that in a case where volatility and impulse control factor so large, was it not considered that service that might be helpful to Ms. S[.] might be anger management?

"A. I don't know that I ever thought of actually sending her to an anger management group, and I still wouldn't consider that for her because I don't think she would cooperate with that kind of group. She would be in there with couples who potentially have domestic violence histories.

"She was extremely critical of anyone who was on welfare, had any criminal record; so the thought of her—she berated me about everything that I referred her to. That parenting was all set up for unemployed welfare recipients, and she shouldn't have to be in there with those people.

"So I would have tried to get her to do anger management with a therapist.

"Q. But you didn't?

"A. Well, I would actually say yes, I did, because I repeatedly tried to get her to go into therapy, and she immediately went in and told them, 'I don't have any problems.'

"And, you know, that is one of the difficulties with, you know, deep denial about a mental health issue is it becomes—it's not—this isn't a court-ordered treatment that— where she's going to be hospitalized and, you know, forced to sit through therapy. So there's not a whole lot I could do."

Petitioner testified that "I have been diagnosed" with "Bipolar I." She is seeing her doctor once a month since December; and "taking my medication as prescribed." Her doctor has twice reduced the dosage of one of those medications. She is employed, has her own housing (she lives in a room in a house in Contra Costa County with a single mother and her son), and visits Jeremiah once a week. "I am ready to take my son home and celebrate Palm Sunday this weekend."

Petitioner testified on cross-examination that she has not "looked into" what "individual therapy services" are available to her through Kaiser. She did not attack her mother, or the paternal grandmother, and only "shoved" the first caseworker. The reason

9

she takes Jeremiah's toys at the end of a visit is the fear that the paternal grandmother will throw them away.

Petitioner's testimony was marked by her sparring and splitting hairs when being questioned. But the most notable aspect of petitioner's testimony was her dogged refusal to admit that she has anything beyond a mental health "diagnosis," and even that she disagreed with that conclusion. Counsel for Jeremiah was the first to try to elicit such an acknowledgement, but gave up after getting nothing but "a nonresponsive answer." When the court took over, it too gave up in frustration, stating, "We will have the record reflect that the witness is declining to answer."

Counsel for Jeremiah supported the Agency's recommendations. To the question of whether petitioner has "made significant progress in resolving the problems that led to the child's removal," he argued "the answer is absolutely zero, no, none whatsoever." After petitioner yelled "not true," counsel continued that she "sabotaged therapy by self-reporting in her own words that everything is fine . . . ." "[W]hatever meds she's been taking are, have not resolved the issues. They haven't even helped . . . ." "[A]ny plan that the Agency wanted her to engage in was out the window. She would throw the envelopes away, she would hang up on the worker, she would yell. This agency has gone above and beyond any type of . . . reasonable efforts . . . . I would say it's incredible efforts." "I believe that given the law and given the facts, the Court has no choice but to terminate services because I don't think the Court can make the findings under 366.21." Counsel for the father concurred.

Petitioner's counsel made an extensive, and impassioned, argument on her behalf, making the points of the trial brief. Yet even he felt compelled to concede that petitioner "is a difficult client" and "is confounding in not wanting to engage and the reasons that she gives for not wanting to engage." He faulted the Agency for not responding to the psychological evaluation of Dr. Parsons (which is not in the record submitted in support of the petition): "On the issue of reasonable services, there was no implementation of the recommendations of Amy Parsons, despite the fact that those recommendations were in the Agency's hands on December 17th. Specifically and most significantly is Amy

10

Parson's observation that for the diagnosis of personality disorder not otherwise specified, that Ms. S[.] is not amenable to treatment for this, but she will likely be responsive to behavioral modification techniques. So that recommendation was not addressed in any serious way to specifically tailor a case plan to meet that diagnosis."

On the last day of the six-month review hearing, the court stated its decision:

"The Court finds that conditions still exist which would justify [the] initial assumption of jurisdiction under Section 300, or such conditions are likely to exist were supervision withdrawn. And that a return of the child to his parents would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being. And the facts upon which the decision that a return of the child would be detrimental is based were set out in some detail in the reports that were received in evidence, as well as the testimony that was heard at trial.

"But the Court will summarize it by saying that mother is unable to acknowledge her mental health issues. [¶] . . . [¶] . . . and unable to deal with them such that she can safely parent her child.

"Similarly, father has mental health issues which he has acknowledged prevent him from being able to parent the child safely.

"The Court finds by clear and convincing evidence that . . . mother has failed to participate regularly in the court-ordered treatment plan, and I cannot on the basis of the evidence that was presented to me find that there is a substantial probability of return of the child to her in the next six months. And the Court hereby orders reunification services terminated.

"The Court finds that the child's placement is necessary and appropriate.

"That the Agency has complied with the case plan by making reasonable efforts to return the child to a safe home, and to complete whatever steps are necessary to finalize the child's permanent placement.

"And the extent of progress . . . towards alleviating or mitigating the causes necessitating placement has been minimal to moderate.

11

"By clear and convincing evidence reasonable services were provided to the parents.

"The Court will renew dependency status. The child will remain in the care and custody of the [Agency] for placement, planning and supervision.

"The Court approves the continuing placement of the child with the grandparent. And the likely permanent plan, which will be determined in a different hearing, will be adoption by the grandparent.

"And the Court will set a .26 hearing . . . ."

## REVIEW

### The Adequacy Of Services Finding

"The court may not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent . . . ." (§ 366.21, subd. (g)(1)(C); see Cal. Rules of Court, rule 5.708(m).)

"[W]henever a child is removed from a parent's . . . custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother . . . ." (§ 361.5, subd. (a).) "It is difficult, if not impossible, to exaggerate the importance of reunification in the dependency system. With but few exceptions, whenever a minor is removed from parental custody, the juvenile court is required to provide services to the parent for the purpose of facilitating reunification of the family. [Citation.] Each reunification plan must be appropriate to the parent's circumstances. [Citations.] The plan should be specific and internally consistent, with the overall goal of resumption of a family relationship. [Citations.] The agency must make reasonable efforts to provide suitable services, 'in spite of the difficulties of doing so or the prospects of success.' [Citation.]" (*In re Luke L.* (1996) 44 Cal.App.4th 670, 678.)

" 'The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case.' [Citations.] . . . '[T]he record should show that the supervising agency identified the problems . . . maintained *reasonable* contact with the parents during the course of the

12

service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citations.]" (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011.) But the reunification services offered have only to be reasonable; perfection is not expected or required. (*In re Jasmon O*. (1994) 8 Cal.4th 398, 425; *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R*. (1991) 2 Cal.App.4th 538, 547.) The reasonableness of reunification services is to be determined in light of all relevant circumstances, which include "the mental condition of the parent, her insight into the family's problems, and her willingness to accept and participate in appropriate services." (*In re Christina L*. (1992) 3 Cal.App.4th 404, 416.)

The reunification process is a collaborative effort. "Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent." (*In re Jonathan R*. (1989) 211 Cal.App.3d 1214, 1220.) "Once a parent has been located, it becomes the obligation of the parent to communicate with the [the social services agency] and participate in the reunification process." (*In re Raymond R*. (1994) 26 Cal.App.4th 436, 441.) If the parent believes that the reunification services are inadequate or misdirected, the parent cannot remain silent about such deficiencies during the reunification period, and then complain as the period is about to end, or raise the perceived deficiencies on appeal. (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1092-1093; *In re Christina L*., *supra*, 3 Cal.App.4th 404, 416.)

"The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency . . . is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions. A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an

13

impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go 'on hold' while the parent makes another stab at compliance." (*In re Michael S*. (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)

The juvenile court is required to have clear and convincing evidence when it finds that the reunification services offered were adequate, but that finding is reviewed on appeal for substantial evidence. (*In re Alvin R*. (2003) 108 Cal.App.4th 962, 971; *In re Maria S*. (2000) 82 Cal.App.4th 1032, 1039.)

An appellate court conducting an examination for substantial evidence has a very constrained scope of operation: " 'The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to other appeals. If there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.] We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence. [Citations.]' " (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; see *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346 [regarding a "reasonableness of services" finding].)

The two particulars identified in the petition are that "anger management classes were not offered," and "the Agency never attempted to visit [petitioner] at her house between December [2014] and March [2015]."

It is not clear whether petitioner means to continue attacking the adequacy of the case plan because it made no provision for anger management. If this is her intent, it cannot succeed. The time to point out problems with a case plan is when it is proposed, and before it is adopted by the juvenile court at the dispositional hearing and, if that objection was overruled, to raise the issue by appeal from the dispositional order. She made no such objection at the hearing and did not appeal. This court has held that " 'A

14

challenge to the most recent order entered in a dependency . . . may not challenge prior orders for which the statutory time for filing an appeal has passed.' " (*In re Jesse W.* (2001) 93 Cal.App.4th 349, 355.) The issue was therefore not preserved for review. (*V.C. v. Superior Court* (2010) 188 Cal.App.4th 521, 527-528; *In re Precious J.* (1996) 42 Cal.App.4th 1463, 1476.)

Thus, no argument can be made based on what was in Dr. Parson's psychological evaluation, because it was not developed until after petitioner's case plan had already been adopted. And the Agency cannot be criticized for failing to visit petitioner, when it is clear petitioner herself was refusing to provide the Agency with her address. It is even more apparent that for an extended period of time petitioner had in essence voluntarily and largely withdrawn from the reunification process. Petitioner will not now be heard to complain about the adequacy of the services she spurned.

As for what services the Agency did offer, "the record should show that [it] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parent[] during the course of the service plan, and made *reasonable* efforts to assist the parent[] in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) This record so shows.

### The Detriment Finding

"At the review hearing held six months after the initial dispositional hearing, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child . . . . In making its determination, the court shall review and consider the social worker's report and recommendations . . . , and shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself to services . . . ." (§ 366.21, subd. (e).) In order to find a substantial probability of return, the court must find the parent regularly visited the child, made

15

significant progress in resolving the problem prompting removal of the child, and demonstrated the capacity and ability to complete the objectives of the case plan and provide for the child's safety, protection, and well-being. (§ 366.21, subd. (g)(1); see Cal. Rules of Court, rule 5.710(b).) This finding is also reviewed for substantial evidence. (*In re E.D.* (2013) 217 Cal.App.4th 960, 966; *James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020.)

Caseworker Cohen's characterizations of petitioner's attitude as "very uncooperative," and her compliance with the case plan as "minimal" (the latter being adopted by court), are fully supported by the record. She consistently minimizes the harm and damage she causes others while euphemizing what is legitimately attributable to her. Four people—including Jeremiah—have sought judicial protection against petitioner's aggressive impulses. The use petitioner made of the reunification services offered was spotty, and did not commence until she accepted the imminent likelihood of losing Jeremiah. Until that acceptance, petitioner had not paid a single visit to her son. This record leaves no doubt that petitioner has not yet conquered the forces that have impaired her full enjoyment of life and prevented her from the unsupervised exercise of parental responsibilities. In the circumstances, there was ample proof that Jeremiah's safety and well-being could not be assured if he was returned to petitioner's custody. In other words, the detriment finding is supported by substantial evidence.

## DISPOSITION

The petition is denied on the merits. This opinion is final forthwith. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).) The stay heretofore issued is dissolved.

16

_____

Richman, J.

We concur:

_____

Kline, P. J.


_____

Stewart, J.

A144879; *Diana S. v. The Superior Court of the City and County of San Francisco*